IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERALD THOMAS OBERG,

      Plaintiff,               No. CIV S-03-1519 FCD GGH P

   vs.

EDWARD ALAMEIDA, et al.,      ORDER AND

      Defendants.         FINDINGS & RECOMMENDATIONS

_____/

      Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that he received inadequate medical care for hepatitis C. Pending before the court is defendants' summary judgment motion filed February 22, 2005.  Also pending is plaintiff's motion to strike defendants' motion filed March 22, 2005.  After carefully considering the record, the court recommends that defendants' motion be granted and orders plaintiff's motion denied.

Motion to Strike

      Plaintiff argues that defendants' motion should be denied because they already filed a summary judgment motion which the court earlier denied.  Court records indicate that on October 23, 2004, defendants filed a motion to dismiss for failure to exhaust administrative remedies and for failure to state a claim.  On January 13, 2004, the court recommended that the

1

1  motion to dismiss for failure to exhaust administrative remedies be denied and that the motion to

2  dismiss for failure to state a claim be granted in part and denied in part.  On April 1, 2004, the

3  district court adopted these findings and recommendations.  The pending motion is defendants'

4  first summary judgment motion.  Plaintiff's motion to strike is denied.

5  Summary Judgment Motion

6            *Summary Judgment Standards Under Rule 56*

7         Summary judgment is appropriate when it is demonstrated that there exists "no

8  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

9  matter of law."  Fed. R. Civ. P. 56(c).

10         Under summary judgment practice, the moving party

11      always bears the initial responsibility of informing the district court
   of the basis for its motion, and identifying those portions of "the

12      pleadings, depositions, answers to interrogatories, and admissions
   on file, together with the affidavits, if any," which it believes

13      demonstrate the absence of a genuine issue of material fact.

14  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

15  P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

16  issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

17  depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

18  should be entered, after adequate time for discovery and upon motion, against a party who fails to

19  make a showing sufficient to establish the existence of an element essential to that party's case,

20  and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

21  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

22  necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

23  should be granted, "so long as whatever is before the district court demonstrates that the standard

24  for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

25  2553.

26  /////

1      If the moving party meets its initial responsibility, the burden then shifts to the

2  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

4  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

5  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

6  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

7  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

8  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

9  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

10 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

11 Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

12 dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

13 nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

14      In the endeavor to establish the existence of a factual dispute, the opposing party

15 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17 versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

18 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19 genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

20 56(e) advisory committee's note on 1963 amendments).

21      In resolving the summary judgment motion, the court examines the pleadings,

22 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23 any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25 court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

26 at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

3

1  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

2  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

3  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

4  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

5  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

7         On August 19, 2003, the court advised plaintiff of the requirements for opposing a

8  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

9  F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.

10  1988).

11            *Legal Standard for Eighth Amendment Claim*

12         In order to state a § 1983 claim for violation of the Eighth Amendment based on

13  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

14  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

15  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

16  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

17  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

18  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

19  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

20         A serious medical need exists if the failure to treat a prisoner's condition could

21  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

22  that a prisoner has a serious need for medical treatment are the following:  the existence of an

23  injury that a reasonable doctor or patient would find important and worthy of comment or

24  treatment; the presence of a medical condition that significantly affects an individual's daily

25  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

26  F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

4

1   (9th Cir. 1989). <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059-60 (9th Cir. 1992), <u>overruled on other</u>

2   <u>grounds</u>, <u>WMX Technologies v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc).

3           In <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

4   defined a very strict standard which a plaintiff must meet in order to establish "deliberate

5   indifference." Of course, negligence is insufficient. <u>Farmer</u>, 511 U.S. at 835, 114 S. Ct. at 1978.

6   However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

7   which is so obvious that it should be known) is insufficient. <u>Id.</u> at 836-37, 114 S. Ct. at 1979.

8   Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

9   should have known of the risk. <u>Id.</u> at 842, 114 S. Ct. at 1981.

10          It is nothing less than recklessness in the criminal sense—a subjective standard—

11  disregard of a risk of harm of which the actor is <u>actually</u> aware. <u>Id.</u> at 838-842, 114 S. Ct. at

12  1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn

13  that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837,

14  114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

15  of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id.</u> at

16  847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his

17  knowledge of a substantial risk of serious harm." <u>Id.</u> at 842, 114 S. Ct. at 1981. If the risk was

18  obvious, the trier of fact may infer that a defendant knew of the risk. <u>Id.</u> at 840-42, 114 S. Ct. at

19  1981. However, obviousness <u>per se</u> will not impart knowledge as a matter of law.

20          Also significant to the analysis is the well established principle that mere

21  differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

22  Amendment violation. <u>Jackson v. McIntosh</u>, 90 F.3d 330 (9th Cir. 1996); <u>Franklin v. Oregon</u>,

23  662 F.2d 1337, 1344 (9th Cir. 1981).

24          Moreover, a physician need not fail to treat an inmate altogether in order to violate

25  that inmate's Eighth Amendment rights. <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir.

26  1989). A failure to <u>competently</u> treat a serious medical condition, even if some treatment is

1   prescribed, may constitute deliberate indifference in a particular case.  Id.

2            Additionally, mere delay in medical treatment without more is insufficient to state

3   a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

4   F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

5   no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

6   Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

7   1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

8   to provide additional support for a claim of deliberate indifference; however, it does not end the

9   inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

10  medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

11  needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

12  the defendant."  McGuckin, 974 F.2d at 1061.

13           Superimposed on these Eighth Amendment standards is the fact that in cases

14  involving complex medical issues where plaintiff contests the type of treatment he received,

15  expert opinion will almost always be necessary to establish the necessary level of deliberate

16  indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

17  may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

18  treatment he received equated with deliberate indifference thereby creating a material issue of

19  fact, summary judgment should be entered for defendants.  The dispositive question on this

20  summary judgment motion is ultimately not what was the most appropriate course of treatment

21  for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

22  criminally reckless.

23           *Undisputed Facts*

24           Plaintiff alleges that defendants delayed in treating him for hepatitis C.  Named as

25  defendants are Edward Alameida, Tom Carey, A. Traquina and Merle Sogge.  The court

26  dismissed the claims against defendants Alameida and Carey in their individual capacities.  See

6

1  April 1, 2004, order.  Therefore, the remaining claims against these two defendants are for

2  injunctive relief only.

3  　　　　The following facts appear undisputed except where otherwise noted.  On April 5,

4  1999, plaintiff arrived at California State Prison-San Quentin Reception Center.  Defendants'

5  Exhibits, Exhibit A, attachment 1, p. 3. On reception, plaintiff did not list hepatitis as a current

6  problem.  Id., Exhibit B, attachment 1, pp. 30-35.   In the complaint, plaintiff alleges that blood

7  work was done at San Quentin.  However, plaintiff's medical records indicate that no blood tests

8  for hepatitis were ordered at that time.  Id.

9  　　　　On July 1, 1999, plaintiff was sent to California State Prison-Solano (CSP-

10 Solano).  Id., Exhibit A, attachment 1, p. 3.  Plaintiff's medical screening form does not indicate

11 that he informed CSP-Solano doctors that he had hepatitis C.  Id., Exhibit B, attachment 1, p. 36.

12 Plaintiff's medical records do not indicate that any blood tests for hepatitis were ordered at this

13 time.  Id., pp. 36-39.  In his verified complaint, plaintiff alleges that blood work was done at the

14 time he arrived at CSP-Solano.  However, plaintiff has presented no evidence demonstrating that

15 this blood work included testing for hepatitis C.

16 　　　　On June 2, 2000, Dr. Low did a General Medicine Chronic Care Intake Evaluation

17 of plaintiff.  Id., pp. 40-40-42.  Dr. Low ordered various tests, including a hepatitis ABC panel

18 and liver function test with a follow-up in September 2000.  Id.  Test results two weeks later

19 indicated that plaintiff was positive for hepatitis C.  Id., pp. 105-110.  The entry in plaintiff's

20 medical records from his September 14, 2000, follow-up examination state that plaintiff refused

21 to see the doctor stating, "I don't now why I got a ducat...I need to see a foot doctor–not a sick

22 call doctor."  Id., p. 46.  In his response to plaintiff's first set of interrogatories, defendant Sogge

23 states that plaintiff's June 2000 blood tests indicated no inflammatory process of the liver.  Id.,

24 Exhibit D, p. 8.  As a result, further testing and treatment for plaintiff was not indicated at that

25 time.  Id.

26 /////

1   On March 14, 2002, plaintiff was found with inmate-manufactured alcohol. Id.,

2   attachment 1, p. 4-6.  Drinking alcohol greatly increases the chances the hepatitis C will cause

3   serious liver problems. Id., Exhibit F.

4   Plaintiff's medical records indicate that on January 24, 2002, he saw doctor

5   Hirsch. Id., Exhibit B, attachment 1, p. 51.  The entry indicates that they discussed plaintiff's

6   hepatitis C and plaintiff admitted that he had been drinking alcohol. Id.  Dr. Hirsch ordered

7   blood tests to check plaintiff's hepatitis C. Id.  The results of this blood work indicated

8   inflammation of the liver. Id., pp. 113- 114; exhibit D, p. 8.  On April 24, 2002, plaintiff saw Dr.

9   Hirsch for a follow-up on the lab results. Id., Exhibit B, attachment 1, p. 84.  In his verified

10  complaint, plaintiff alleges that it was at this examination that he was first told that he actually

11  had chronic hepatitis C.  Dr. Hirsch ordered additional blood tests for a hepatitis C genotype,

12  LFT's, and a right upper quadrant ultrasound. Id.; Exhibit D, p. 8.  The ultrasound done on April

13  30, 2002, showed no evidence of intra-abdominal pathology. Id., Exhibit B, attachment 1, p.

14  117.

15  On June 4, 2002, plaintiff was transferred to the Santa Clara County Jail before

16  the other tests ordered by Dr. Hirsch could be done. Id., Exhibit D, p. 8.  Plaintiff returned to

17  CSP-Solano on July 10, 2002. Id., Exhibit A, attachment 1, p. 3.  On July 26, 2002, Dr. Obedoza

18  re-ordered the lab tests ordered by Dr. Hirsch on April 24, 2002, that had not been completed.

19  Id., Exhibit B, attachment 1, p. 58.  These tests were done on August 7, 2002. Id., Exhibit D, p.

20  9.  The results showed elevated AST and ALT, ANA positive, HCV BDNA and HCV genotype

21  2b. Id.  On August 30, 2002, Dr. Obedoza noted the results and ordered a gastroenterology

22  consultation for plaintiff. Id., Exhibit D, p. 9.

23  On October 29, 2002, a physician saw plaintiff for a problem due to sensitive

24  skin. Id., Exhibit B, attachment 1, p. 61.  This doctor, whose name the court cannot make out in

25  the medical records, ordered that plaintiff be referred for hepatitis C follow up. Id.  On

26  November 22, 2004, plaintiff refused a ducat to sick call and told nursing staff, "I don't need to

8

1   see a doctor.  I don't know why I was ducated."  Id.

2          On December 3, 2002, defendant Traquina renewed plaintiff's prescription for

3   Dyazide.  Id., pp. 61-88.   Dyazide is a medication for hypertension.  Physicians' Desk Reference,

4   5th ed., 1999, p. 3045.

5          On December 30, 2002, defendant Sogge, the gastroenterologist, saw plaintiff.

6   Id., Exhibit D, p. 9.  Defendant Sogge noted plaintiff's elevated AST, ALT and viral load with

7   HCV genotype 2b.  Id.  Defendant Sogge's assessment was hepatitis C with questionable history

8   activity.  Id.  Defendant Sogge ordered a liver biopsy to further evaluate whether treatment was

9   indicated.  Id.  On March 14, 2003, the liver biopsy was performed.  Id.  The results were

10  compatible with cirrhosis, without fatty change, bile statis or pigment.  Id.  The biopsy showed

11  lobular inflammatory activity but no polarizing material.  Id.  There was extensive interface

12  change and apparent regenerating nodules without central veins.  Id.  There was fibrous tissue at

13  the edges of several of the fragments which was seen in cirrhosis.  Id.  The impression was

14  chronic hepatitis C, Grade 3, stage 4 compatible with cirrhosis.  Id.

15         On April 1, 2003, a nurse noted that plaintiff had requested a copy of his test

16  results.  Id., Exhibit B, attachment 1, p. 67.  On that date, plaintiff was seen by Dr. Hoover whose

17  plan was to await the results of the liver biopsy which he had apparently not seen yet.  Id.

18         On July 7, 2003, plaintiff had a follow up appointment with defendant Sogge.  Id.,

19  Exhibit D, p. 9.  At that time, plaintiff complained that he had been trying to get treated for his

20  hepatitis C for four years.  Id.  Defendant Sogge told plaintiff that in 1999 his LFT's were

21  normal, which would not have been an indication for treatment.  Id.  Defendant Sogge ordered

22  plaintiff placed on combination therapy (peglyated interferon, 64 m.c.g. a week and ribavarin,

23  400 m.g., b.i.d..) for 24 weeks.  Id.

24         On September 15, 2003, defendant Sogge saw plaintiff for follow up and

25  reviewed the results of lab tests reported on August 22 and 25, 2003, which showed low WBC

26  (1.5), low hemoglobin (9.3), low platelets (63), and low ANC (400).  Id.  Defendant Sogge's

1  impression was that plaintiff had significant pancytopenia secondary to interferon and ribavarin.

2  Id., pp. 9-10. Defendant Sogge ordered Nuepogen (filgrastim), 200 m.g., b.i.d. for 14 weeks, a

3  decrease in the ribavarin to 200 m.g., b.i.d., for 14 weeks, a CBC every week for 14 weeks, and a

4  follow up visit the next week. Id., p. 10.

5        Defendant Sogge saw plaintiff on October 3, 2003, and reviewed the results of

6  repeat lab tests reported on September 30 and October 4, 2003. Id. Those tests showed a high

7  WBC (19.1) and a further drop in hemoglobin (8.6) and platelets (57) and that ANC was still low

8  in spite of the Neupogen. Id. ALT and AST were within normal range as was HCV RNA,

9  quantitative BDNA which was less than 615 IU/mL. Id. Defendant Sogge noted that plaintiff

10  had significant pancytopenia and weight loss secondary to combination therapy. Id. As a result,

11  defendant Sogge ordered the treatment stopped because of the side effects of treatment and a

12  CBC in one month with a follow up visit in two months. Id.

13        Within a few days, plaintiff was seen for the symptoms of an upper respiratory

14  infection (URI). Id. An x-ray showed hyperaeuration and the suspicion of subtle right middle

15  lob pneumonia. Id. Treatment was ordered, and plaintiff was referred back to defendant Sogge.

16  Id. Defendant Sogge saw plaintiff on October 17, 2003, and noted the URI symptoms and his

17  ability to gain weight. Id. Defendant Sogge ordered Resource, one can a day for 30 days and

18  follow up in one month. Id. Plaintiff did not show up for sick call on November 19, 2003. Id.

19        On March 29, 2004, defendant Sogge saw plaintiff for a six month follow up. Id.

20  Defendant noted that plaintiff had been off combination therapy for a few months and had been

21  gaining weight. Id. Defendant decided to recheck plaintiff's viral load and liver function tests

22  (LFTs's) and noted the results of a CBC done in January 2004 which were normal except for a

23  low platelet count. Id.

24        On June 25, 2004, defendant Sogge saw plaintiff again. Id. At that time he noted

25  that viral load tests done in May 2004 were less than 614 and that plaintiff's LFT's were normal.

26  Id. Defendant's assessment was that plaintiff had a sustained response to therapy and ordered a

1  follow up in six months.  Id.

2           *Defendant Sogge*

3           Plaintiff argues that his treatment for hepatitis C was delayed and inadequate.

4  Defendants argue that there is no evidence that defendant Sogge acted with deliberate

5  indifference to plaintiff's serious medical condition of hepatitis C.

6           As indicated above, defendant Sogge first saw plaintiff on December 30, 2002.

7  Therefore, defendant Sogge cannot be liable for any alleged unconstitutional medical care,

8  including delay, that occurred prior to that time.  On December 30, 2002, defendant Sogge

9  ordered a variety of tests including a liver biopsy.  Plaintiff next saw defendant Sogge

10 approximately six months later in July 2003 when he placed plaintiff on interferon treatment.  On

11 September 15, 2003, defendant Sogge examined plaintiff and changed his treatment based on the

12 results of lab work performed in August 2003.  On October 3, 2003, defendant Sogge ordered the

13 interferon treatment stopped because of side effects.  On October 17, 2003, defendant Sogge

14 ordered Resource for plaintiff and a follow up in one month.  Plaintiff failed to appear for this

15 follow up.  Defendant Sogge next saw plaintiff on March 29, 2004, at which time he rechecked

16 plaintiff's viral load and liver function.  On June 25, 2004, defendant saw plaintiff again at which

17 time he noted a low viral load and a normal LFT reading.  He determined that plaintiff had a

18 sustained response to therapy.

19          The only possible delay in defendant Sogge's treatment of plaintiff was the six

20 months between the time defendant first examined plaintiff and when he placed plaintiff on

21 interferon treatment.  In his response to plaintiff's interrogatories, defendant Sogge stated that he

22 was not responsible for scheduling the follow up and that any delay in the start of treatment had

23 no effect on its success.  Defendants' Exhibits, Exhibit D, p. 11.  Plaintiff has presented no

24 expert evidence countering defendants' representation that the delay in the start of treatment was

25 not harmful.  Accordingly, the court finds that defendant is entitled to summary judgment with

26 respect to plaintiff's claim challenging the delay in the start of treatment.

1    With respect to the other treatment provided by defendant Sogge, the evidence

2 indicates that defendant Sogge regularly examined plaintiff and monitored his condition.  The

3 record does not support a claim of deliberate indifference by defendant Sogge to plaintiff's

4 serious medical condition.  Plaintiff has presented no expert evidence demonstrating that he

5 should have received treatment other than that provided by defendant Sogge.  Accordingly,

6 defendant Sogge should be granted summary judgment as to plaintiff's claim that the treatment

7 provided was constitutionally deficient.

8    *Defendant Traquina*

9    The only claim against defendant Traquina is that on June 20, 2003, plaintiff sent

10 defendant Traquina a complaint alleging that he had been repeatedly denied medical care for his

11 hepatitis C.  As indicated above, on July 7, 2003, defendant Sogge placed plaintiff on interferon

12 treatment, following which time he continued to monitor plaintiff's condition.

13    There is no evidence that defendant Traquina ever treated plaintiff for his hepatitis

14 C or otherwise contributed to any alleged delay in receipt of medical care.  In fact, shortly after

15 plaintiff sent the letter to defendant Traquina, plaintiff saw defendant Sogge and began treatment.

16 This record does not demonstrate deliberate indifference by defendant Traquina to plaintiff's

17 serious medical needs.  Accordingly, defendant Traquina should be granted summary judgment.

18    *Defendants Carey and Alameida*

19    As discussed above, the only remaining claims against defendants Carey and

20 Alameida are for injunctive relief.  To succeed on a claim for injunctive relief against these

21 defendants in their official capacities, a policy or procedure of the state must be at issue.  Haber

22 v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358-361-62 (1991).  Plaintiff has presented no evidence

23 suggesting that a state policy or procedure is at issue.  In addition, plaintiff does not present

24 evidence that his current treatment is anything but proper for his present condition.  For this

25 reason, defendants Carey and Alameida should be granted summary judgment.

26 \\\\\

1         Accordingly, IT IS HEREBY ORDERED that plaintiff's March 22, 2005, motion

2 to strike is denied; and

3         IT IS HEREBY RECOMMENDED that defendants' February 22, 2005, summary

4 judgment motion be granted.

5         These findings and recommendations are submitted to the United States District

6 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

7 days after being served with these findings and recommendations, any party may file written

8 objections with the court and serve a copy on all parties.  Such a document should be captioned

9 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10 shall be served and filed within ten days after service of the objections.  The parties are advised

11 that failure to file objections within the specified time may waive the right to appeal the District

12 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

13 DATED:   6/17/05

14

15                         /s/ Gregory G. Hollows

16                         _____
                        GREGORY G. HOLLOWS
                        UNITED STATES MAGISTRATE JUDGE

17

18 ggh:kj
ob1419.sj

19

20

21

22

23

24

25

26